UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


| | |
|---|---|
| CMI ASSOCIATES, LLC, | ) |
| AS TRUSTEE OF KELLY-FOSTER | ) |
| REALTY TRUST, and CYNTHIA | ) |
| MICHAUD, | ) |
|        Plaintiffs | ) |
| | ) |
|        v. | ) |
| | ) |
| REGIONAL FINANCING CO., | ) |
| LLC, JOSEPH GIUTTARI, | ) |
| and HALLINAN CAPITAL | )    C.A. No. 09-cv-30024-MAP |
| CORPORATION, | ) |
|        Defendants and | ) |
|        Third Party | ) |
|        Plaintiffs | ) |
| | ) |
|        v. | ) |
| | ) |
| JEFFREY HARDIMAN, ET AL., | ) |
|        Third Party | ) |
|        Defendants | ) |


MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
THIRD-PARTY DEFENDANT HARDIMAN'S MOTION FOR SUMMARY
JUDGMENT, AND THIRD-PARTY DEFENDANT TASSONI'S
MOTION FOR SUMMARY JUDGMENT
(Dkt. Nos. 136, 152, & 156)

April 5, 2011

PONSOR, D.J.

## I.   INTRODUCTION

This is an action for slander of title, breach of
contract, negligent misrepresentation, negligent

interference with "business expectancy," wrongful execution, and violation of Mass. Gen. Laws ch. 93A. Plaintiffs CMI Associates, LLC, trustee of a Massachusetts nominee trust, and Cynthia Michaud seek to recover damages arising from a series of land speculation and financing transactions in Palmer, Massachusetts.

Although the background of this case is rather complex, Plaintiffs assert, in essence, that Defendant Hallinan Capital Corporation, seeking to collect on a judgment against a debtor named George Petropoulos, improperly obtained a property execution through its agent, Defendant Regional Financing Co., against real property owned by Plaintiffs in Palmer, Massachusetts. Unbeknownst to Hallinan, Petropoulos had assigned his interest in the Palmer property back to Plaintiffs and no longer held any interest in the Palmer property, thus making the execution invalid. Plaintiffs assert that this action, in conjunction with a subsequent re-mortgaging that referred to Petropoulos's assignment of interest as a "potential fraudulent conveyance," clouded title to the property and resulted in foreclosure.

Plaintiffs' amended complaint contains eight counts.
Two counts are directed against Defendant Hallinan: slander
of title (Count I) and wrongful execution (Count VI).
Plaintiffs bring five counts against Defendants Regional
Financing Co., LLC and Giuttari: slander of title (Count
II); breach of contract (Count III); negligent interference
with business expectancy (Count V); wrongful execution
(Count VII); and unfair trade practices under Chapter 93A
(Count VIII).  Plaintiffs bring one count for negligent
misrepresentation (Count IV) against Defendant Giuttari
alone.[1]

Defendants have filed an amended third-party complaint
(Dkt. No. 118) against Attorney Jeffrey Hardiman, Attorney
Frank Tassoni, and Plaintiff Cynthia Michaud.  Defendants
assert two counts against Plaintiff Michaud for breach of
fiduciary duty (Count I) and contribution and indemnifica-
tion (Count II).  Defendants bring two counts against
Attorney Hardiman for contribution and indemnification

---

[1] Notably, Plaintiffs do not asserts claims against
Third-Party Defendants Hardiman and Tassoni because
Plaintiffs are currently pursuing claims of legal
malpractice against these individuals in state court.

3

(Count III) and legal malpractice (Count IV).  Defendants

bring one claim against Attorney Tassoni for contribution

and indemnification (Count V).  In addition, Third-Party

Defendants Tassoni and Hardiman have filed cross claims

against one another for contribution and indemnification.

Presently before this court are Defendants' Motion for

Summary Judgment (Dkt. No. 136), Third-Party Defendant

Hardiman's Motion for Summary Judgment (Dkt. No. 152),[2] and

Third-Party Defendant Tassoni's Motion for Summary Judgment

(Dkt. No. 156).  For the reasons stated below, the court

will allow Defendants' motion (Dkt. No. 136).  It will deny

Third-Party Defendants' motions (Dkt. Nos. 152 and 156),

without prejudice, pending a status conference at which the

impact of the court's ruling on Defendants' motion for

summary judgment can be addressed.

## II.  FACTUAL BACKGROUND

Taken in a light most favorable to the non-moving

parties, Plaintiffs, the relevant facts are as follows.

---

[2] Third-Party Defendant Reiner, Reiner and Bendette
P.C. ("RR&B"), Attorney Hardiman's law firm, also joined
this motion.  By agreement of the parties, RR&B has been
dismissed from the case.

A.  <u>The Palmer Property and the Kelly-Foster Realty Trust</u>.

As part of a March 31, 2004, divorce decree and settlement, Plaintiff Cynthia Michaud ("Michaud") was assigned a one-hundred-percent interest in a twenty-three-acre plot of land in Palmer, Massachusetts ("the Palmer property").  The land was held by a nominee trust known as the Kelly-Foster Realty Trust ("the Trust"), which was administered by Plaintiff CMI Associates, LLC as sole trustee.  Michaud is the sole member and manager of CMI Associates, LLC.  Shortly after her divorce settlement, Michaud discovered that a local land developer named George Petropoulos also claimed an interest in the Palmer property based on cash payments he had allegedly made to Plaintiff's ex-husband.  Rather than litigating Petropoulos's claims on the merits, Michaud granted Petropoulos a fifty-percent interest in exchange for his agreement to help develop the parcel of land.

In August 2006, Michaud and Petropoulos procured a $150,000 development capital loan from Defendant Hallinan Capital Corporation ("Hallinan"), which was secured by a mortgage on the Palmer property.  They each received one-

half of the Hallinan loan proceeds and agreed to spend the monies developing the Palmer property. Michaud and Petropoulos were personally liable, jointly and severally, for the repayment of the entire Hallinan note. The deal was brokered by Defendant Regional Financing Co., LLC ("Regional"), a Rhode Island mortgage brokerage company. Regional's owner and principal is Defendant Joseph Giuttari ("Giuttari"). Petropoulos introduced Michaud to Giuttari and Hallinan. Unbeknownst to Michaud, Petropoulos had had prior business dealings with both and was already indebted to Hallinan on a separate loan obligation brokered by Giuttari.

On March 30, 2007, the Trust extinguished the Hallinan note and mortgage obligation by obtaining $180,000 in substitute financing from the Hallmarc Nominee Trust ("Hallmarc"). The Hallmarc loan was secured by a mortgage on the Palmer property, which Hallmarc properly recorded. The Hallmarc promissory note was personally guaranteed by Michaud and Petropoulos.

On April 4, 2007, the Trust borrowed an additional $50,000 in soft cost development capital from Whitehall

Management International, Inc. ("Whitehall").  The Whitehall loan was also secured by a properly recorded mortgage on the Palmer property and personally guaranteed by Michaud and Petropoulos.  Shortly thereafter, Hallinan executed a discharge and release of its mortgage on the Palmer property.  Both the Hallmarc and Whitehall loans were brokered by Giuttari.

In the months that followed, Petropoulos spent his half of the Hallmarc and Whitehall proceeds on business unrelated to the development of the Palmer property.  Moreover, unbeknownst to Michaud and despite assertions to the contrary, Petropoulos failed to make payments on the Hallmarc and Whitehall mortgages.  In June 2007, Michaud discovered that the mortgages were in default for non-payment and the Palmer property was in jeopardy of foreclosure.  Consequently, Michaud and the Trust threatened suit against Petropoulos.  In order to avoid litigation, Petropoulos, Michaud, and the Trust adopted a settlement agreement wherein Petropoulos agreed to assign back all his legal and equitable interests and to assume certain Trust debt obligations.  Petropoulos executed an assignment

agreement that transferred all of his interest in the Palmer property to the Trust on September 25, 2007. The agreement was recorded on November 6, 2007.

In October 2007, the town of Palmer granted final approval to develop the Palmer property. Throughout the fall of 2007, Plaintiffs assert, Giuttari repeatedly advised and encouraged Michaud to refinance the Palmer property so as to avoid the threat of foreclosure by Hallmarc or Whitehall. Plaintiffs allege that Giuttari repeatedly assured Michaud that by refinancing, "the title would be clear" and the property would be immediately marketable. (Dkt. No. 165, Ex. 5, Michaud Aff. ¶ 31.) Michaud informed Giuttari that, as she already had interested buyers, any substitute financing would be short term.

B.    The Petropoulos Judgment and Execution.

While Michaud was involved in the above financing transactions, Giuttari, acting as Hallinan's agent, hired Third-Party Defendant Attorney Jeffrey Hardiman ("Attorney Hardiman") to aid in collecting an unrelated debt owed by Petropoulos to Hallinan. In May 2007, Attorney Hardiman asked Giuttari for a list of properties in which Hardiman

believed Petropoulos had an interest.  Giuttari complied, providing a list that included the Palmer property, in which Petropoulos owned a fifty-percent interest at that time.

On May 24, Attorney Hardiman filed a complaint on behalf of Hallinan against Petropoulos in the Hampden Superior Court.  On October 3, Attorney Hardiman obtained a default judgment against Petropoulos in the amount of $287,484.53.  Attorney Hardiman then filed a request for execution with the court, which issued the execution ("the Execution") on November 7 in the above amount seizing "all the right, title, and interest (not exempt by law from attachment by levy on execution), which [George Petropoulos] has in and to the following described real property."  (Dkt. No. 158, Ex. W.)  The Execution contained an attachment describing the parcel of land referred to herein as "the Palmer property."  Two days later, on November 9, Hardiman recorded the Execution with the Hampden County Registry of Deeds.

As noted, three days prior to the recording of the Execution, Petropoulos had assigned his entire interest in the Palmer property to the Trust.  Consequently, Plaintiffs

argue that the Execution wrongly stated that Petropoulos retained an interest in the Palmer property. Plaintiffs also allege that during a meeting with Michaud in Guittari's office in October 2007 Giutarri learned that Petropoulos no longer had any interest in the property and, subsequently, failed to disclose this information to Attorney Hardiman before he recorded the Execution. Defendants dispute this fact and assert that Giuttari only learned about the assignment of interest <u>after</u> the Execution was recorded.

In addition, Plaintiffs allege that in January 2008, Giuttari told Petropoulos that he (Giuttari) intended to attach the Palmer property on behalf of Hallinan to secure payment on the judgment. When Petropoulos then informed Michaud of the possible encumbrance, she contacted Giuttari, who allegedly told her that he had not placed an encumbrance on the property and that she should not trust Petropoulos.

Plaintiffs maintain that Giuttari persuaded Michaud to have CMI refinance the Palmer property and thus cure any default problems associated with the Hallmarc and Whitehall mortgages. As part of his pitch, Plaintiffs say, Giuttari

allegedly assured Michaud that refinancing would clear title to the Palmer property and facilitate its sale.

C.   The Northborough Loan.

On February 8, 2008, the Trust obtained $450,000 in substitute financing from Northborough Capital Lenders, LLC ("Northborough"), which was secured by a mortgage on the Palmer property.  As with all other financing deals relating to the Palmer property, this deal was brokered by Regional through Giuttari.  Michaud used the loan proceeds to pay off the Hallmarc and Whitehall mortgage obligations, thus releasing Michaud and Petropoulos of their personal guarantee obligations.  Hallmarc and Whitehall each executed a discharge and release of their respective mortgages on the Palmer property.  The Northborough promissory note, personally guaranteed by Plaintiff only, had a six-month maturity date.

Third-Party Defendant Attorney Frank Tassoni ("Attorney Tassoni"), an attorney whom Michaud had neither retained nor ever met before, was present at the Northborough loan closing and somehow purported to represent Michaud and the Trust.  Upon the advice of Attorney Tassoni, Michaud agreed

to sign a document subordinating the questionable Execution to the Northborough mortgage ("the Subordination of Execution"), thus giving Northborough a superior interest in the property. (Dkt. No. 138, Ex. J.) Significantly, the Subordination of Execution, which was drafted by Attorney Tassoni, contained a clause stating that Petropoulos had assigned his beneficial interest in the Palmer property to the Trust and that this action constituted "a potential Fraudulent Conveyance of which the Trust may be liable." (Id.)

Plaintiffs allege that Attorney Tassoni failed to explain to Michaud the nature or legal significance of much of the loan documentation, including the Subordination of Execution, used to close the refinancing.[3] Plaintiffs assert that this was the result of a conflict of interest, as Attorney Tassoni had been contacted by Giuttari and had represented Hallinan on several occasions in the past.

---

[3] Prior to the financing, in October 2008, Michaud suffered a severe head injury, which "rendered [her] incapable of handling or even understanding the simplest of financial affairs." (Dkt. No. 169, Ex. 5, Michaud Aff. ¶ 32.) Plaintiffs contend that this injury made Michaud particularly vulnerable at the time of the Northborough refinancing.

Defendants contend that Attorney Tassoni represented Plaintiffs and no one else.

D.    Potential Purchasers.

In February and March 2008, Michaud attempted to sell the Palmer property to no avail.  Just prior to the Northborough refinancing, Michaud had met with a potential purchaser named Earnest Roy who allegedly performed due diligence on the property, made an oral offer of $925,000, and paid Michaud a $25,000 deposit.  However, Roy lost interest in the property and withdrew his offer in February. Plaintiffs contend that Roy abandoned his interest in the Palmer property as a result of the shadow over the deal cast by the transactions described above.  Plaintiffs further allege that a second potential purchaser, unidentified in the papers,[4] similarly lost interest.  Michaud also sought title insurance from Chicago Title Company, which, Plaintiffs contend, refused to issue title insurance due to the property's "clouded title."   (Dkt. No. 169, Ex. 5, Michaud Aff. ¶ 51.)  As a result of Plaintiffs' inability to

---

[4] The parties have, however, identified the unknown purchaser's real estate agent as Mitchell Saunders.

sell the Palmer property, Northborough foreclosed on the property on January 9, 2009.

### III.  DISCUSSION

#### A.  The Summary Judgment Standard.

It is well established that "when a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-movant cannot rest upon mere allegations; rather, he must set forth "specific, provable facts demonstrating that there is a triable issue."  Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989).  See also D. Mass. R. 56.1 (requiring that a non-moving party's opposition to a motion for summary judgment include "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation").

#### B.  Defendants' Motion for Summary Judgment (Dkt No. 136).

Before examining Plaintiffs' individual claims, the court must address a preliminary matter. Plaintiffs have filed multiple claims against Defendant Joseph Giuttari; however, all of these claims arise from actions taken by Defendant Giuttari in his official capacity as owner and principal of Regional Financing Co., LLC. Under Massachusetts law,

> the debts, obligations and liabilities of [an LLC], whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the [LLC]; and no member or manager of [an LLC] shall be personally liable, directly or indirectly, . . . for any such debt, obligation or liability of the [LLC] solely by reason of being a member or acting as a member of the [LLC].

Mass. Gen. Laws ch. 156C, § 22. The impact of this statute is fatal to the claims against Defendant Giuttari individually. The court will therefore address the counts asserted against both Giuttari and Regional as claims against Defendant Regional only. As to Count IV, which is asserted against Defendant Giuttari alone, Defendants' motion will be allowed.

1. <u>Slander of Title</u>.

15

Counts I and II allege slander of title against Defendants Regional and Hallinan.  Slander of title is a tort action for damage to real property resulting from "'interference with title to real estate by falsehoods which, although not personally defamatory, cause the plaintiff pecuniary loss through interference with . . . dominion over his property.'"  <u>Salloom v. Lister</u>, 2004 WL 1836027, 18 Mass. L. Rptr. 165, at *2 (Mass. Super. 2004) (quoting Karen McConnel, <u>Slander of Title: Onward Through the Fog</u>, 24 S. Tex. L. Rev. 171, 171 (1983)).  In Massachusetts, a person is liable for slander of title, <u>i.e.</u>, "injurious falsehood," if he or she (a) publishes a false statement; (b) that harms the interests of another; (c) with the intent to harm the interests of another or "either recognizes or should recognize that it is likely to do so;" and (d) knows that the statement is false "or acts in reckless disregard of its truth or falsity."  <u>Dulgarian v. Stone</u>, 652 N.E.2d 603, 609 (Mass. 1995) (quoting Restatement (Second) of Torts § 623A).  Hallinan and Regional contend that Plaintiffs cannot satisfy any of the foregoing elements, and this court must agree.

16

a. <u>Falsity</u>.

As an important initial matter, the court must note that only one of the two potentially actionable statements is properly attributable to Defendants. Underlying their claims for slander of title, Plaintiffs point to statements made in both the Execution and the Subordination of Execution. Critically, though, Defendants had no part in drafting the latter document. In fact, it was Plaintiffs' own attorney, Attorney Tassoni, who created the Subordination of Execution that implied that Plaintiffs' interest in the Palmer property was the result of a "potential fraudulent conveyance." (Dkt. No. 138, Ex. J.) Although Plaintiffs contend that Attorney Tassoni labored under a conflict of interest, they do not dispute that Attorney Tassoni drafted the Subordination or that he represented Plaintiff Michaud at the refinancing. (<u>See</u> Dkt. No. 169, Ex. 5, Michaud Aff. ¶ 40 ("Frank Tassoni performed legal services for me and the Kelly Foster Realty Trust at the closing and in so doing assumed all of the duties and obligations of an attorney representing a client.").) Plaintiffs' intimation that Defendants Hallinan and Regional

17

(through Giuttari) asserted some subtle influence over Attorney Tassoni is wholly speculative and unsupported by the record.

The only statements for which Defendants could be found liable, then, are contained in the Execution itself.  As noted, the Execution, by its own terms, "seized all the right, title, and interest (not exempt by law from attachment by levy on execution), which [George Petropoulos] has in and to the following described real property" and includes a description of the Palmer property.  (Dkt. No. 158, Ex. W.)  Simply put, this is not a false statement. The Execution did not proclaim that George Petropoulos maintained a particular ownership interest in the Palmer property, and it did not assert any claim to the property on Petropoulos's behalf.  Rather, it merely stated that whatever interest Petropoulos had in the property was subject to attachment and execution by his creditors.  If records showed that Petropoulos owned a one-hundred percent interest, then this document would make the entire parcel subject to execution.  If Petropoulos's creditors could prove that he maintained a fifty-percent interest, then half

of it would be subject to execution.  Or if, as here, Petropoulos no longer retained any interest in the Palmer property, then the document would have no effect on that property.  Plaintiffs have failed to identify a false statement anywhere in this document, and, consequently, they cannot maintain a cause of action for slander of title. Although the court could conclude its analysis here, prudence compels the court to point out Plaintiffs' inability to satisfy the remaining elements of this claim.

b.    <u>Causing Harm to the Interests of Another</u>.

For the sake of clarity, the court will treat the issues of causation and damages separately.

i.    <u>Causation</u>.

Plaintiffs also have produced insufficient evidence that Defendants' actions were the proximate cause of any harm they may have suffered.  Plaintiffs contend both that the Execution impaired title to the property and that the Subordination of Execution substantially exacerbated the impairment.  Defendants have pointed out several weaknesses in this argument.

First, contrary to Plaintiffs' suggestions, the Execution did not cloud title to the Palmer property. A cloud on title "is the semblance of a title or interest which, although in fact unfounded, nevertheless appears to be valid and casts a doubt on the validity of the record title." 74 C.J.S. Quieting Title § 12. In Massachusetts,

> [t]he title of a person against whom there is a recorded seizure on execution is not on that account defective if:
>
> . . . .
>
> 2) the seizure purports to be of land of one not a party to the proceeding in which the execution was issued . . . .

28B Mass. Prac., REBA Title Std. No. 47 (4th ed.).

It is undisputed that Plaintiffs were not party to the proceeding in which the Execution was issued. Thus, even under Plaintiffs' broad interpretation of the Execution -- that the Execution purported to seize the Palmer property itself, without respect to Petropoulos's ownership interest -- the property's title would remain unaffected.

Moreover, as explained above, the Execution in fact only purported to seize any and all interest <u>George Petropoulos</u> held in the Palmer property. On November 9, the

date that the Execution was recorded, Petropoulos held no interest in the property, rendering the Execution utterly ineffectual.  Had the Execution been recorded <u>prior</u> to Petropoulos's assignment of interest, it may have cast doubt on the validity of the property's record title.  <u>See</u> Mass. Gen. Laws ch. 236, § 24 (stating that if a levy of an execution on land is properly recorded, then "the levy shall be valid and effectual as against a conveyance, attachment or levy made [by subsequent creditors and purchasers] <u>after such recording</u>") (emphasis added).  Such is not the case here.

The opinions of two real estate experts retained by Third-Party Defendants Hardiman and Tassoni support this court's conclusion.  Third-Party Defendant Hardiman's legal expert, Attorney Dennis E. Tully, opined that the Execution "did not affect the marketability" of the Palmer property in part because the Execution was outside the property's record chain of title.  (Dkt. No. 158, Ex. X, Tully Rep.)  Attorney Tully also noted that the Execution "could not be enforced or levied upon" and, thus, amounted to "a worthless Execution."  (<u>Id.</u>)  Third-Party Defendant Tassoni's expert,

Attorney Robert J. Hoffman, agreed and concluded that "[n]either the Execution nor the subordination caused the Palmer property to be unmarketable." (Dkt. No. 138, Ex. Q, at 2.)

The report of Plaintiffs' expert, real estate attorney Richard I. Goldman, does not alter the court's analysis. Attorney Goldman opined that the recording of the Execution was negligent because it "initiated a chain of events that caused the recording of a Subordination of Execution with language concerning a potential fraudulent transfer which destroyed the marketability of title." (Dkt. No. 169, Ex. 10, Goldman Rep. at 2.) Assuming <u>arguendo</u> that the Subordination of Execution had this effect, merely initiating a "chain of events" that caused another party to allegedly slander Plaintiffs' property is insufficient to support a claim against Defendants. The publication of the defamatory statement must be a "direct and proximate cause" of Plaintiffs' injuries in order for Plaintiffs to recover damages. 37 Mass. Prac., Tort Law § 7.1 (3d ed. 2010). Notwithstanding Attorney Goldman's opinion to the contrary, taking some action, not in itself improper, that prompts

some third party to publish a slanderous statement cannot make the original, innocent actor liable for the resultant harm.

Here, Defendants could not possibly have foreseen that recording an execution against Petropoulos's interest in the Palmer property would cause Plaintiffs' own attorney, in the middle of a refinancing transaction, to refer to his own client's property as the subject of a "potential fraudulent conveyance." This latter action may or may not constitute legal malpractice,[5] but it certainly does not weigh on Defendants' liability in the present action.

Nor could Defendants have reasonably foreseen that the Execution would cause a buyer to withdraw an offer to purchase the property. Although, as explained below, Plaintiffs have produced scant evidence that they actually lost a potential sale, Defendants could not reasonably expect that the Execution would influence a potential buyer

---

[5] To be clear, the court reserves judgment on the issue of Attorney Tassoni's liability, as this issue is not presently before the court. As noted in footnote one, Plaintiffs have not brought a claim against Attorney Tassoni in this court and, instead, are litigating a legal malpractice claim against him in state court.

in any significant way.  As explained by Defendant Tassoni's
expert, Attorney Hoffman,

> [o]bjections to title are common occurrences for
> which remedies . . . are commonly available.  A
> reasonable buyer, especially if represented by a
> real estate attorney, as one would expect in a
> commercial transaction, would know that the remedy
> in this case was not difficult.

(Dkt. No. 138, Ex. Q, Hoffman Rep.)  Certainly, a reasonable
person might expect that enforcing a judgment against
Petropoulos's interest at a time <u>when he still held an
interest</u> in the property could affect a potential sale.  <u>See</u>
Mass. Gen. Laws ch. 236, § 24.  Here, however, it is
undisputed that Petropoulos held no such interest at the
pertinent time.  The existence of the Execution was
therefore, at worst, a fly speck on the Palmer property
title that could easily have been resolved by a competent
real estate attorney.

Moreover, if Plaintiffs ever had any concern about the
effect of the Execution, they could have and should have
filed an action to quiet title.  They took no such action.
The Execution was recorded on November 9, 2007, and the
Northborough closing took place three months later on
February 8, 2008.  Plaintiffs did not seek, upon the advice

of Attorney Tassoni or otherwise, to remove the Execution before the closing, during the closing, or immediately thereafter.[6]  This too may have relevance in Plaintiffs' state court proceeding against Attorney Tassoni, but it holds no weight here, except insofar as it provides another layer of distance between the recording of the Execution and the ultimate foreclosure.

Finally, Plaintiffs also point to an email from a representative at Chicago Title Insurance Co., but this evidence adds nothing to the causation analysis.  The representative, Stephen Leecock, noted that it "appears from some of the documents that there may be an issue of fraudulent conveyance" and concluded that he "would not insure either an owner or a lender."  (Dkt. No. 169, Ex. 9, Leecock email.)  This email does not explain what impact, if any, the Execution would have had on the property absent Attorney Tassoni's reference to a "potential fraudulent conveyance," and, thus, it does not support a conclusion

_____

[6] It was not until April 2008, well after Roy had lost interest in the property, that Plaintiffs sought and Defendant Hallinan granted a limited release of execution. (Dkt. No. 158, Ex. HH.)

that the Execution itself was a direct and proximate cause

of Plaintiffs' alleged injuries.  Additionally, Leecock

states that he <u>would</u> consider insuring a lender as long as

the Execution was subordinated to the lender's interests, as

it was here.  (<u>Id.</u> ("The only avenue for insuring a lender

would be what was done previously and that was the

subordination of execution.").)  In any event, the court is

convinced, for the foregoing reasons, that no reasonable

jury could find that Defendants' actions were the proximate

cause of any damages sustained by Plaintiffs.

### ii.  <u>Damages</u>.

Apart from the problems summarized above, Plaintiffs

also have not presented sufficient evidence upon which a

reasonable jury could conclude that they lost one or more

potential purchasers as a result of Defendants' actions.

"When the loss of a specific sale is relied on to establish

pecuniary loss, it must be proved that the publication was a

substantial factor influencing the specific, identified

purchaser in his decision not to buy."  Restatement (Second)

of Torts § 633 cmt. g (1977).

Although Plaintiffs have claimed that two potential purchasers existed at one point, they have been unable to identify the second individual or offer an explanation of his reasons for losing interest in the Palmer property. The only identified party who expressed any interest in the Palmer property in early 2008 was Ernest Roy, who, Plaintiffs contend, made an oral offer to purchase the property for $925,000 and paid Plaintiff Michaud a $25,000 deposit.

Roy's affidavit states that "on or about February 19, 2008, I met with Dr. Michaud . . . [and] we agreed on a sales price of $925,000." (Dkt. No. 169, Ex. 8, Roy Aff. ¶ 11.) However, at his deposition, Roy made clear that this agreement was not nearly as firm as his affidavit suggests. First, he testified that he never signed a purchase-and-sale agreement. (Dkt. No. 158, Ex. KK, Roy Dep. at 45:1-7.) He further testified that "we did not fully agree on 925" and that "925 was maybe a number that we were working with, but I thought when it came down to hard numbers . . . it would be a little better than that." (Id. at 43:11-44:4.) Nonetheless, Roy wired Plaintiff Michaud $25,000 because

"she needed some immediate cash" and he "wanted to keep the [conversation] alive." (Id. at 45:8-18.) Roy also referred to himself as a "cash buyer" who "probably would have tried to split the risk" by bringing in a partner, but it never progressed to that point because "it wasn't that solid of a deal." (Id. at 111:22-112:10.) He then clarified, "this deal -- I won't even call it a deal. This lead . . . seemed to have potential at that particular time." (Id. at 112:24-113:2.)

Roy also gave multiple reasons for walking away from this "lead." His affidavit states only that the property "was encumbered by an execution running in favor of [Hallinan] and that the Palmer property was also over encumbered by mortgages which exceeded the purchase price of the Palmer property." (Dkt. No. 169, Ex. 8, Roy Aff. ¶ 12.) At his deposition, however, Roy emphasized his wariness of George Petropoulos, who had introduced him to Plaintiff Michaud, as a driving factor behind his decision. Roy testified that Petropoulos appeared "anxious" and was "pushing" him to move forward on the deal. (Dkt. No. 158, Ex. KK, Roy Dep. at 31:17-21.) Later in his deposition, Roy

28

repeated that Petropoulos was "pushing for me to do the deal," which made him feel like Petropoulos "had more [to] gain" and "wasn't just trying to put a good [deal] in my lap." (Id. at 113:3-19.) Furthermore, he noted that "George has had some problems in the last few years . . . And I'll say that out of ten deals [presented by Petropoulos], if one really, really looks good, I will look at it really, really close and I'll consider it." (Id. at 113:24-114:8.)

When asked squarely "what effect, if any, the execution had on [his] decision," Roy could only state that he "work[s] on visions" and "the picture was changing," in part "because [Michaud's] idea of developing was too rich for that particular area" and because he "decided there's just too many [other] good deals out there." (Id. at 54:3-24.)

In sum, Roy made clear that he did not consider the Palmer property anything more than a "lead" and that his wariness of George Petropoulos would cause him to walk away from nine out of ten leads that Petropoulos presented to him. When asked how the Execution specifically influenced his decision, he instead pointed to a perceived flaw in

Plaintiffs' development plan and the existence of "too many good deals out there." (Id. at 54:3-24.)  Based on this testimony, in addition to the other defects in Plaintiffs' claim, a reasonable jury could not find that the Execution caused or contributed in any substantial way to the loss of an impending sale to Ernest Roy, or to anyone else.

        c.    <u>Intent to Harm</u>.

Plaintiffs also have not produced sufficient evidence that Defendants acted with the intent to harm their interests or that Defendants should have recognized that their actions were likely to produce that result.  <u>See</u> <u>Dulgarian v. Stone</u>, 652 N.E.2d 603, 609 (Mass. 1995). Plaintiffs do not point to any specific evidence of bad intent, but rather argue that Defendants should have been aware of the likely impact that their actions would have on Plaintiffs' ability to sell the Palmer property.  However, this court has already considered and rejected the notion that the Execution itself had any appreciable impact on the marketability of the property, which also undercuts Plaintiffs' argument here.  In addition, it is worth noting that in May 2007, when Giuttari hired Attorney Hardiman on

Hallinan's behalf and notified him of Petropoulos's interest in the Palmer property, Petropoulos <u>did</u>, in fact, have an interest in the property.  Consequently, Plaintiffs have failed to produce "sufficient evidence to permit the conclusion that the defendant[s] in fact entertained serious doubts as to the truth of [the] publication."  <u>Netherwood v. Am. Fed. of State, Cnty., & Mun. Employees, Local 1725</u>, 757 N.E.2d 257, 264 (Mass. App. Ct. 2001) (citation omitted).

      d.  <u>Knowledge of Falsity</u>.

The final element of slander of title requires the defendant to know that the statement was false or act in reckless disregard of its truth or falsity.  <u>See</u> <u>Dulgarian</u>, 652 N.E.2d at 603.  Because Plaintiffs have failed to demonstrate that the Execution contained a false statement, they cannot satisfy this element.  Accordingly, Plaintiffs have not satisfied the elements of slander of title, and the court will allow Defendants' motion with respect to Counts I and II.

      2.  <u>Wrongful Execution</u>.

Plaintiffs assert Count VI against Defendant Hallinan and Count VII against Defendants Regional and Giuttari[7] for wrongful execution on real property.  There is a dearth of relevant case law in Massachusetts governing wrongful executions in the last century.  As a result, Plaintiffs rely primarily upon Rogers v. Barnes, 47 N.E. 602 (Mass. 1897), in which the Massachusetts Supreme Judicial Court upheld a nineteenth century action for wrongful execution. However, Rogers is clearly inapposite, as it involved "misconduct in executing a power of sale."  Id. at 602. There, the defendant had sold the mortgaged premises at a public auction.  Id.  Here, Defendants took no such action. In fact, as explained above, the Execution had absolutely no effect given that at the time of its recording Petropoulos no longer had an interest in the property.  See Mass. Gen. Laws ch. 236, § 24.

Plaintiffs' reliance on a passage in Corpus Juris Secundum is similarly misplaced.  The relevant excerpt

---

[7] The court reiterates that Defendant Giuttari is shielded from liability by Mass. Gen. Laws ch. 156C, § 22. Thus, the court will treat claims asserted against Defendants Regional and Guittari as claims against Regional alone.

observes that a defendant will be liable for wrongful execution if he or she "procured, directed, or assisted in the commission of the wrongful act by an officer in issuing an execution, or in making a levy or sale thereunder." 33 C.J.S. Executions § 641. An execution is "wrongful" if it is "issued on a void, satisfied, or extinguished judgment." 33 C.J.S. Executions § 637. As the narrative above makes clear, the record of this case supports no such conclusion. Accordingly, the court will allow Defendants' motion with respect to Count VI (against Defendant Hallinan) and Count VII (against Defendants Regional and Giuttari).

      3.  <u>Breach of Contract</u>.

     Under Count III, Plaintiffs assert a claim for breach of contract against Defendants Regional and Giuttari. To prove breach of contract, Plaintiffs must demonstrate (1) that the parties reached a valid and binding agreement; (2) that Defendants breached the terms of the agreement; and (3) that Plaintiffs have suffered damages as a result. <u>Coll. v. PB Diagnostic Sys., Inc.</u>, 50 F.3d 1115, 1122 (1st Cir. 1995) (applying Massachusetts law). Defendants argue that Plaintiffs have not identified any binding agreement between

33

the parties.  Plaintiffs point to the contract for mortgage brokerage services, but they have not identified any contractual provision breached by Defendants.  Thus, the court will allow Defendants' motion as to Count III.

    4.  <u>Negligent Interference with Business Expectancy</u>.

    Count V alleges negligent interference with business expectancy against Defendants Giuttari and Regional.  To succeed on this claim, also referred to as "tortious interference with prospective contractual relations," Plaintiffs must demonstrate (1) a business relationship or contemplated contract; (2) Defendants' knowledge of such relationship; (3) interference with that relationship through improper motive or means; and (4) damages resulting directly from that conduct.  <u>Adcom Prod., Inc. v. Konica Bus. Machines USA, Inc.</u>, 668 N.E.2d 866, 869 (Mass. App. Ct. 1996).

    Plaintiffs argue that Defendants Giuttari and Regional knowingly and improperly interfered with Plaintiffs' business relationship with Roy.  For the reasons stated above, Plaintiffs did not have an ongoing business relationship with Ernest Roy; even if such a relationship

existed, Defendants did not interfere with it; and even if Defendants interfered with it, Plaintiffs have not demonstrated improper motive or means.  Accordingly, the court will allow Defendants' motion as to Count V.

     5.   <u>Negligent Misrepresentation</u>.

Count IV alleges negligent misrepresentation against Defendant Giuttari alone.  However, as explained above, Plaintiffs cannot maintain any claims against Defendant Guittari individually and, therefore, the court will allow Defendants' motion as to Count IV.

     6.   <u>Mass. Gen. Laws ch. 93A</u>.

The court has already determined that Plaintiffs' other claims are meritless, and Plaintiffs have provided no independent basis for an action under Mass. Gen. Laws ch. 93A.  Thus, the court will allow Defendants' motion as to Count VIII.

C.   <u>Third-Party Defendants' Motions for Summary Judgment (Dkt Nos. 152 & 156)</u>.

Defendants have filed an amended third-party complaint (Dkt. No. 118) alleging breach of fiduciary duty against Michaud (Count I) and legal malpractice against Attorney Hardiman (Count IV), and seeking contribution and

indemnification against Michaud, Attorney Hardiman, and
Attorney Tassoni for damages arising from Plaintiffs'
complaint (Counts II, III, and V).  Third-Party Defendants
Hardiman and Tassoni have filed cross claims against one
another for contribution and indemnification.

At the present time, it is unclear whether the third-
party complaint survives the court's rulings above.
Certainly, the counts seeking indemnification and
contribution for damages arising from Plaintiffs' complaint
(Counts II, III, and V) are extinguished, but it is less
clear whether Third-Party Plaintiffs may continue to pursue
Counts I and IV for breach of fiduciary duty and legal
malpractice.  One potential issue is whether the court can
maintain jurisdiction over the third-party complaint, as
Regional, Giuttari, and Hardiman are all citizens of Rhode
Island.  Given these lingering questions, the court will
deny Third-Party Defendants' motions at this time, without
prejudice, pending a status conference where these parties
may assess their intentions in light of the court's rulings
on Defendants' motion for summary judgment.

## IV.   CONCLUSION

For the foregoing reasons, the court hereby ALLOWS
Defendants' Motion for Summary Judgment (Dkt. No. 136).  The
court hereby DENIES Third-Party Defendants' motions (Dkt.
Nos. 152 & 156), without prejudice.  The clerk will schedule
a status conference to discuss future proceedings.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge